UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| **LIBERTY ENERGY INC.; NOMAD PROPPANT SERVICES LLC,** | |
| *Plaintiffs*, | |
| v. | Case No. 3:24-cv-739 |
| | **COMPLAINT** |
| **SECURITIES AND EXCHANGE COMMISSION,** | |
| *Defendant*. | |

Plaintiffs Liberty Energy Inc. and Nomad Proppant Services LLC, by and through counsel, and for their Complaint against Defendant the Securities and Exchange Commission hereby state as follows:

## INTRODUCTION

1.      Plaintiffs challenge the Securities and Exchange Commission's (SEC's) recent rule entitled *The Enhancement and Standardization of Climate-Related Disclosures for Investors* ("Rule"), 89 Fed. Reg. 21668 (Mar. 28, 2024), which directly or indirectly regulates significant aspects of the country's economy under the guise of requiring detailed (and wildly speculative) disclosures about "climate-related risks" and "greenhouse gas" emissions. Public companies must attempt to collect and calculate not just their own direct emissions and climate risks but also those of certain third parties, including climate risks faced by their suppliers. Public companies must also shoehorn qualitative environmental information like "transition risks" and "severe weather events" into financial accounting that investors rely on for accurate financials.

2.      The Rule is unique in the history of the SEC. Never before has it claimed the power to demand such broad "climate"-related disclosures, which will occupy a significant portion of public companies' SEC filings and subject them to increased enforcement and litigation. In fact,

the SEC stated for nearly 50 years that it lacks the power to do so absent a change in statutory authority—which has not materialized.

3.      The Rule is promulgated, in part, pursuant to the Securities Act, *see* 15 U.S.C. 77i, which directs challenges to such rules exclusively to the circuit courts, *see, e.g., Twin Rivers Paper Co. LLC v. SEC*, 934 F.3d 607, 617 n.1 (D.C. Cir. 2019). Other portions of the Rule, however, were promulgated pursuant to provisions of the Exchange Act that do not authorize immediate circuit court review. *See* 15 U.S.C. § 78y(b).

4.      In similar circumstances, circuit courts have nonetheless exercised jurisdiction over all challenges to such rules. *See Int'l Bhd. of Teamsters v. Pena*, 17 F.3d 1478, 1482 (D.C. Cir. 1994); *Connors v. Amax Coal Co.*, 858 F.2d 1226, 1231 (7th Cir. 1988); *Suburban O'Hare Comm'n v. Dole*, 787 F.2d 186, 192–93 (7th Cir. 1986); *General Elec. Uranium Mgmt. Corp. v. Dep't of Energy*, 764 F.2d 896, 903 (D.C. Cir. 1985); *see also Byrum v. Landreth*, 566 F.3d 442, 449 (5th Cir. 2009).

5.      Accordingly, Plaintiffs filed a petition for review in the Fifth Circuit and challenged the entire Rule. *See Liberty Energy Inc. v. SEC*, No. 24-60109 (5th Cir.). That challenge was then ordered transferred to the Eighth Circuit pursuant to the multi-circuit lottery for challenges brought against agency rules in multiple circuits. *See* 28 U.S.C. § 2112. Neither Court has yet determined conclusively that it possesses jurisdiction over all challenges to the Rule.

6.      In the event that a district court is determined to have jurisdiction over Plaintiffs' challenge or a portion thereof, however, Plaintiffs intend to seek injunctive and declaratory relief, as well as vacatur of the Rule. Accordingly, they file this Complaint in an abundance of caution.

## JURISDICTION AND VENUE

7.      In the event a district court is determined to have jurisdiction over some or all of the challenges to the Rule, such jurisdiction would flow from 5 U.S.C. §§ 701–706, and 28 U.S.C. §§ 1331, 1346, 1361, and 2201.

8.      Venue is proper under 28 U.S.C. § 1391(e)(1) because an agency of the United States is a Defendant, and Plaintiff Nomad Proppant Services LLC maintains its principal place of business in this District (Dallas, Texas).

## PARTIES AND INJURY

9.      Plaintiff Liberty Energy Inc. is a leading North American oilfield services firm that offers cutting-edge completion services and technologies to onshore oil and natural gas exploration and production companies. Ex.D (Wright Decl.) ¶2. Liberty is subject to the Rule. Ex.E (Stock Decl.) ¶7. From Liberty's perspective, the regulatory regime the Rule imposes is on par with that required by the Sarbanes-Oxley Act of 2002 (SOX). *Id.* ¶17. Liberty's direct, out-of-pocket compliance-related costs for SOX exceeded $500,000 for the 2022 fiscal year, and total annual costs for SOX compliance exceed $1 million per year. *Id.* ¶18. Thus, even under a very conservative approach, compliance costs for the Rule will be several hundred thousand dollars per year, with higher costs at the outset. *Id.* ¶20. Those costs will begin accruing immediately because of the need to stand up complex data capturing systems. *Id.* ¶¶23–25.

10.     Nomad Proppant Services LLC is a service-based frac sand company. Ex.F (Johnson Decl.) ¶1. Liberty owns a significant portion of and exercises certain control rights over Nomad. The Rule recognizes registrants (i.e., Liberty) must "seek[] input from third parties" to comply with the "requir[ed] disclosure of material impacts from climate-related risks on purchasers, suppliers, or other counterparties," among "other[s]." Ex.A.657. That imposes "compliance burden[s]" and "increased costs" on "third parties." Ex.A.657–58. Nomad is a prime example. It must "undertake new expenses to investigate our climate-related risks" to report to Liberty, Ex.F.¶11–12, which owns a controlling interest in Nomad that constitutes a "relationship" likely to impact Liberty, Ex.A.658. The Rule will also compel Nomad to report its Scope 1 and 2 GHG emissions to Liberty because it's "not [] possible to use another method of determining [Liberty's] organizational boundaries that would exclude Nomad" as a source of Liberty's emissions. Ex.E¶¶26–33; Ex.F.¶¶10–12. Finally, the Rule harms Nomad's access to capital. Ex.F.¶13.

11.     Defendant the SEC issued the Rule.

**FACTUAL BACKGROUND**

12.     In April 2022, the SEC proposed a rule titled "The Enhancement and Standardization of Climate-Related Disclosures for Investors." 87 Fed. Reg. 21,334 (Apr. 11, 2022). The proposed rule was a thinly veiled attempt to inject the SEC into the world of climate politics by compelling publicly listed companies to disclose a breathtaking volume of information, much of it highly speculative, about greenhouse gas (GHG) emissions (including even by the company's *customers and suppliers*) and "climate-related" risks, on pain of severe government-enforcement and private penalties if any of those disclosures could plausibly be described as misleading.

13.     On March 6, 2024, the SEC finalized the Rule. *See* Ex.A. Although dialed back in a few places from the proposed rule, the Rule still represents a revolutionary change in securities regulation. The Rule requires many publicly listed companies (including Plaintiff Liberty):

    a.     To disclose "Scope 1" GHG emissions, meaning the company's own emissions from every activity the company undertakes (e.g., CO2 emissions from flying to a business meeting); *and* "Scope 2" emissions, meaning all GHG emitted by *third parties* in providing electricity and other energy power sources to the covered company. Ex.A.852.

    b.     To disclose non-material information about company costs "related to severe weather events and other natural conditions." Ex.A.458, 844–47.

    c.     To disclose granular faux-"material" and entirely non-material "climate-related risks" and the company's oversight of those risks, including risks faced by their "suppliers." Ex.A.117, 852–58.

14.     The Rule says Scope 1 and Scope 2 disclosures are required when "material" to the company—and will be subject to attestation requirements imposing heightened liability risks—but the SEC then effectively deems that information material if the company has faced or reasonably might face "transition risk," Ex.A.246, which in turn is defined in a nearly unlimited manner, Ex.A.850–51.

15.     The attached chart tracks how the Rule pervasively seeks to evade "materiality" requirements by omitting them altogether, watering them down, or effectively deeming certain things material. Ex.G.

## ARGUMENTS

### I.     Plaintiffs Are Likely to Succeed on the Merits.

#### A.     The Rule Violates the Major-Questions Doctrine.

16.     Under the major-questions doctrine, when "agencies assert[] highly consequential power beyond what Congress could reasonably be understood to have granted," or "discover in a long-extant statute an unheralded power representing a transformative expansion of … regulatory authority," "there is every reason to hesitate before concluding that Congress meant to confer" the power claimed. *West Virginia v. EPA*, 597 U.S. 697, 724–25 (2022). "We expect Congress to speak clearly if it wishes to assign to an agency decisions of vast economic and political significance." *UARG v. EPA*, 573 U.S. 302, 324 (2014).

17.     Moreover, "[w]hen an agency has no comparative expertise in making certain policy judgments, … Congress presumably would not task it with doing so." *W. Virginia*, 597 U.S. at 729. "[W]e must be guided to a degree by common sense as to the manner in which Congress is likely to delegate a policy decision of such economic and political magnitude to an administrative agency." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000).

18.     As explained below, the Rule checks every box to trigger the major-questions doctrine by purporting to "derive[] its authority from an old statute employed in a novel manner, imposes [over $4] billion in compliance costs, involves broad [scientific] considerations that lie outside of [the SEC's] core competencies, and purports to definitively resolve one of today's most hotly debated political issues," i.e., climate policy. *BST Holdings, LLC v. OSHA*, 17 F.4th 604, 617 (5th Cir. 2021). Yet the SEC lacks any clear authorization, instead invoking only vague provisions authorizing disclosure requirements when "necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 77g(a)(1).

### a.    The Major-Questions Doctrine Applies.

19.    The Rule insists that it is an ordinary exercise of the SEC's disclosure powers and that the SEC remains "agnostic" on matters of climate change. The Court should not be fooled. *See Dep't of Com. v. New York*, 139 S. Ct. 2551, 2575 (2019) (courts are "not required to exhibit a naiveté from which ordinary citizens are free").

20.    The Rule "is climate regulation promulgated under the Commission's seal." Ex.C.1 (Comm'r Uyeda, dissenting). The 886-page Rule "require[s] comprehensive and standardized climate-related disclosures." Ex.A.646.

21.    It even says the quiet part out loud: "mandatory reporting of GHG emissions results in reduced aggregate reported emissions among affected firms." Ex.A.784.

22.    To accomplish that goal, the 886-page Rule imposes climate exceptionalism through "significant additional compliance obligation[s]." Ex.A.248. The Rule "will require comprehensive and standardized climate-related disclosures, including disclosure on governance, business strategy, targets and goals, GHG emissions, risk management, and financial statement metrics." Ex.A.646; *see* Ex.A.566 ("We are requiring climate-related disclosures in most Securities Act or Exchange Act registration statements and Exchange Act periodic reports.").

23.    The specifics of those requirements confirm that the Rule "is climate regulation promulgated under the Commission's seal." Ex.C.1 (Comm'r Uyeda, dissenting). At each step, the Rule demonstrates the SEC's "insistence that climate issues deserve special treatment and disproportionate space in Commission disclosures and managers' and directors' brain space." Ex.B.1 (Comm'r Peirce, dissenting).

24.    For example:

a.    "For no other risk does the Commission require prescriptive, forward-looking disclosure of the risk's impacts on the company's strategy, business model, outlook, financial planning, and capital allocation." Ex.C.2.

6

b.      The "requirement to disclose GHG emissions and obtain an attestation report on such disclosure is in a class of its own without comparison in the Commission's disclosure regime." *Id.*

c.      The Rule "requires disclosure of climate related targets and goals, even though the Commission has no similar requirements for a company's targets and goals related to other, more important matters affecting the company, such as financial performance." *Id.*

d.      Companies must describe "the process of how a company's board oversees and is informed of climate risk, how a company's management assesses and manages material climate risk, which management positions manage climate risk and the associated expertise, the geographic location of physical climate risk, and how climate risks affect items like a company's '[p]roducts or services,' 'suppliers,' climate mitigation activities, and 'expenditures for research and development.'" Ex.B.3.

e.      The Rule acknowledges that "existing rules already require disclosure about material risks," but the SEC nonetheless "continue[s] to believe that a specific disclosure item focusing on managing material climate-related risks is warranted." Ex.A.193.

f.      "In no other context is a company required to provide an explanation of expenses that exceed one percent of income before taxes and analyze the significant contributing factor to the expense," Ex.C.2, but the Rule specially compels that explanation for expenses related to "severe weather events and other natural conditions," Ex.A.845.

g.      Far from remaining "agnostic," the Rule's definitions of transition risk and climate-related risk always assume "reduced market demand for carbon-intensive products." Ex.A.850.

25.     Despite its novelty, the Rule purports to "derive[] its authority from an old statute employed in a novel manner." *BST,* 17 F.4th at 617. The Securities Act was passed in 1933, and the Exchange Act in 1934. For the last 50 years, the SEC itself agreed that it could not mandate blanket climate disclosures. *Environmental and Social Disclosure, Notice of Commission Conclusions and Rulemaking Proposals*, 40 Fed. Reg. 51,656, 51,657 (Nov. 6, 1975). Echoing its 1975 position, the SEC reiterated in 2016 that "disclosure relating to environmental and other matters of social concern should not be required of all registrants *unless appropriate to further a specific congressional mandate* or unless, under the particular facts and circumstances, such matters are material." *Business and Financial Disclosure Required by Regulation S-K*, 81 Fed. Reg. 23,916, 23,970 (Apr. 22, 2016) (emphasis added).

26.     Departing from this longstanding interpretation of its authority, the SEC would now "impose[] [over $4] billion in compliance costs," *BST,* 17 F.4th at 617; Ex.E¶15, and purport to "resolve one of today's most hotly debated political issues," *BST,* 17 F.4th at 617. The Biden Administration itself has made clear that climate issues—including disclosures—are among the most politically significant of our time. *See, e.g.*, E.O. 14030 of May 20, 2021, *Climate-Related Financial Risk*, 86 Fed. Reg. 27,967 (May 25, 2021); *cf. W. Virginia*, 597 U.S. at 731.

27.     In short, the Rule "is an extraordinary exercise of regulatory authority by the Commission that involves economically and politically significant policy decision." Ex.C.2 (Comm'r Uyeda, dissenting).

28.     Moreover, both emissions data itself and determining whether that data is material "involve[] broad [scientific] considerations that lie outside of [the SEC's] core competencies." *BST*, 17 F.4th at 617. The Rule largely adopts "third-party framework[s]" implemented by outsiders, Ex.A.54, precisely because such matters are outside the SEC's bailiwick, *see* Ex.B.2 (Comm'r Peirce, dissenting) ("We lack the expertise to oversee these special interest disclosures.").

29.     Even more tellingly, Congress has already dictated that the EPA—not the SEC—has expertise over climate- and emissions-related issues, including the mandatory disclosures of

climate information. The Clean Air Act tasks the EPA with collecting reports from emission sources and making them available to the public. *See* 42 U.S.C. § 7414; *see also Am. Elec. Power Co. v. Connecticut*, 564 U.S. 410, 426 (2011). It authorizes the EPA to mandate disclosure of emissions data on a "one-time, periodic, or continuous basis" from "any person who owns or operates any emission source, who manufactures emission control equipment or process equipment, who the [EPA] Administrator believes may have information necessary for the purposes set forth in this subsection, or who is subject to any requirement of this chapter." 42 U.S.C. § 7414(a)(1). Congress even stated that "[a]ny records, reports or information obtained under subsection (a) shall be available to the public." *Id.* § 7414(c).

30.    Pursuant to that statutory power, the EPA already requires the disclosure of GHG emissions from all facilities that emit more than 25,000 metric tons of $CO_2$-equivalent per year and from all facilities that supply certain products that would result in over 25,000 metric tons of $CO_2$-equivalent if those products were released. This information is publicly available through the EPA's website and covers more than 8,000 facilities, representing 85 to 90% of all U.S. GHG emissions, *see Greenhouse Gas Reporting Program and the U.S. Inventory of Greenhouse Gas Emissions and Sinks*, EPA, https://www.epa.gov/ghgreporting/greenhouse-gas-reporting-program-and-us-inventory-greenhouse-gas-emissions-and-sinks.

31.    The Rule never persuasively explains why Congress would give the SEC broader climate-disclosure power (and through vague disclosure provisions, no less) than it *expressly* gave to the EPA itself.

32.    Further, the Court "cannot ignore that the regulatory writ [the SEC] newly uncovered conveniently enabled it to enact a program that, long after the dangers posed by greenhouse gas emissions 'had become well known, Congress considered and rejected' multiple times." *W. Virginia*, 597 U.S. at 731. Members of Congress have repeatedly proposed legislation requiring the SEC to mandate disclosure of emissions and climate risks, but those proposals failed to pass. *See, e.g.*, H. Rep. 117-39 (2021) (Climate Risk Disclosure Act); H. Rep. 116-563 (2020);

S. 1217, 117th Cong. (2021); S. 2075, 116th Cong. (2019); S. 3481, 115th Cong. (2018). The SEC decided to act only when Congress declined to do so.

33.     In sum, this is no ordinary disclosure rule, no matter how many times the SEC pays lip service to its ordinary disclosure powers. At every step, the Rule "elevates climate above nearly all other issues facing public companies," forcing them to "become well versed in hurricane categories and the Enhanced Fujita Scale" for tornado ratings. Ex.C.2-3. This "special treatment" of climate eviscerates the SEC's "feign[ed] agnosticism about how public companies should think about climate risk." Ex.B.3. The SEC "is forcing individual companies to operate in a conduct-altering disclosure regime that may have no direct relevance to their situation." *Id.*

34.     The Rule thus ventures far "outside of [the SEC's] lane." Ex.C.2. Add in the undoubtedly enormous economic consequences, Ex.E.15, and the Supreme Court's recognition that climate change is a significant political matter, *see West Virginia v. EPA*, 597 U.S. 697, 731 (2022), and the Rule easily triggers the major-questions doctrine.

35.     Because the major-questions doctrine applies, the SEC must identify *clear* authority for the Rule. It cannot do so, as explained next.

> **b.     The SEC Lacks Clear Authority for the Rule.**

36.     Congress knows how to provide clear authority to an agency to mandate disclosure of climate data: it did so for the EPA, as explained above. But the SEC has no similar grant of clear authority.

37.     ***Clear Authority for Balance-Book Information.*** The SEC relies on statutory language authorizing disclosures when "necessary or appropriate in the public interest or for the protection of investors," and contends that language provides broad authority to demand almost anything the SEC wants. 15 U.S.C. § 77g(a)(1); *see* §§ 77j(c), 78*l*(b)(1), 78o(d), 78m(a); Ex.A.59–69.

38.     Read in context, none of those provisions authorizes the Rule, let alone clearly. Section 77g(a)(1)'s reference to "the public interest" and "protection of investors" must be construed with the rest of that same paragraph, which requires registration statements to include

the specific information in "Schedule A." *See Dubin v. United States*, 599 U.S. 110, 124–25 (2023) (discussing *noscitur a sociis*); *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 512 (2018) (discussing *ejusdem generis*).

39.     The SEC admits that Schedule A deals with "balance sheet and profit and loss statement[s]," Ex.A.68, and has elsewhere conceded the list is "largely financial in nature," 81 Fed. Reg. at 23,921. Thus, under 15 U.S.C. § 77g, the SEC cannot require disclosures of just *anything* it thinks will be in the public interest. The information must be of the same nature as disclosures Congress dictated under Schedule A. *See Ala. Ass'n of Realtors v. Dep't of Health and Hum. Serv.*, 141 S. Ct. 2485, 2488 (2021); Andrew N. Vollmer, *The SEC Lacks Legal Authority to Adopt Climate-Change Disclosure Rules*, (Apr. 12, 2022), https://www.sec.gov/comments/s7-10-22/s71022-20123525-279742.pdf.

40.     Likewise, the grant of disclosure power in § 78*l* is cabined by the eleven expressly listed types of information that must be disclosed, which focus on management and balance-sheet information. 15 U.S.C. § 78*l*(b)(1)(A)–(K). And the SEC's power in § 78m incorporates that same limitation by allowing for disclosure of updated information required by "section 78*l* of this title." *Id.* § 78m(a)(1). It is also limited by a restriction to financial disclosures typically "shown in the balance sheet and earnings statements." *Id.* § 78m(b)(1).

41.     These provisions provide clear authority only for standardized disclosure of management and accepted "balance-book" financial figures. But climate data and risks are of a completely different type: they are not measurements of any traditional financial performance or indicator, and often are entirely outward looking. *See* Vollmer, *supra*, at 15–17. For example, the SEC never explains how a company's *own* GHG emissions somehow reflect its profitability. Rather, the SEC wants them just for disclosure's sake.

42.     The proposed rule even repeatedly made Freudian slips distinguishing "climate-related disclosures" from *actual* "financial disclosures." 87 Fed. Reg. at 21,335, 21,411.

43.     **The SEC Cannot Ignore Materiality or Deem Certain Non-Financial Information to be Material.** The Rule lacks clear authority for another reason: the Securities and

Exchange Acts' references to "the public interest" and "protection of investors" provide clear authority only for compelling the disclosure of information that is *actually* material to the particular company. 15 U.S.C. §§ 77g(a)(1), 77j(c), 78*l*(b)(1), 78o(d), 78m(a).

44.     The Supreme Court has indicated that the "public interest" is not furthered by requiring companies "simply to bury the shareholders in an avalanche of trivial information," which "is hardly conducive to informed decisionmaking" and thus would "accomplish more harm than good." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 448-49 (1976); *see also Basic Inc. v. Levinson*, 485 U.S. 224, 249 (1988); *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 384 (1970). The existing materiality requirement is thus part-and-parcel of the "public interest" text in these statutes.

45.     As proof: when Congress wants the SEC to regulate *outside* the realm of materiality, Congress has provided express and separate authority to do so. 15 U.S.C. §§ 78m(p)(1)(A) (conflict minerals), 78m(q)(2)(A) (resource extraction), 78n(i) (executive compensation). No such authority exists for climate disclosures, of course. This shows: (1) Congress clearly doesn't view the SEC's generic disclosure statutes as particularly broad, and (2) Congress knows how to give the SEC the power to compel non-traditional disclosures but has not done so for climate.

46.     Not "all facts which a reasonable shareholder might consider important" are material, *TSC Indus.*, 426 U.S. at 445, and the Supreme Court has cautioned against "administratively confining materiality to a rigid formula," *Basic*, 485 U.S. at 236. Moreover, information can be material only if it is "sufficiently specific." *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 185 (2d Cir. 2014).

47.     Given that companies must *already* disclose specific issues that are material on a company-specific basis under other SEC regulations, *see* 17 C.F.R. §§ 229.303(a), 229.101(c)(1)(xii), 229.103(c)(3), 229.101(c)(5), 230.408, 240.12b-20, why issue the Rule at all? The SEC wants to mandate disclosure of GHG emissions and climate risks even when they are *not* truly material.

48.     The problem isn't that companies are actually omitting material information; the SEC conspicuously avoids justifying the Rule on the basis that any particular company has actually done so. *E.g.*, Ex.A.89. Rather, as the SEC and institutional investors see it, Ex.A.39n.102 (e.g., BlackRock, CalPERS, Harvard Mgmt.), public companies simply aren't focusing enough attention on the SEC's political cause du jour.

49.     To force companies to talk about climate change, therefore, the SEC had to get creative when it comes to the statutory requirement of materiality, as summarized in the chart attached as Exhibit G.

50.     *First*, for several requirements, the Rule does not even purport to require materiality. Ex.A.852 (board's oversight of climate-related risks), Ex.A.844–45 (expenditures for "severe weather events and other natural occurrences" greater than $100,000); Ex.A.853 (management's "positions" and "committees" for managing climate risk), Ex.A.854 ("geographic location" of physical risks). For others, the Rule invents new, vaguely lower standards than actual materiality. Ex.A.854 ("potential material impacts").

51.     *Second*, throughout the Rule, the SEC directs companies to disclose information that has material impacts "*on*" or is material "*to*" specific company activities, even when not material to the company overall and thus not material to an investor. Ex.A.854 ("material impacts … on the registrant's strategy, business model, and outlook"); *id.* ("material impacts *on* … suppliers, purchasers or counterparties"), Ex.A.856 ("material *to* how [the registrant] evaluates and manages a climate-related risk").

52.     *Third*, even when the Rule purports to require "materiality," it does so "in name only." Ex.B.2. Most notably, the Rule says a company must disclose Scope 1 and 2 emissions only if they are material, Ex.A.859, but then effectively deems materiality triggered when a company faces climate-change "transition risk," Ex.A.246, which in turn is defined so broadly that it sweeps in nearly every company.

53.     For example, the SEC says there is transition risk when "emissions are currently or are reasonably likely to be subject to additional regulatory burdens," Ex.A.246, like when

"governments including the United States and others throughout the world have made public commitments to transition to a lower carbon economy," such as the non-binding Paris Agreement, Ex.A.21n.34. All public companies operate in a country that is at least "reasonably likely" to adopt *non-binding* climate agreements. In fact, the Rule's requirements will *themselves* create transition risk, allowing the SEC to use the Rule to bootstrap reporting requirements.

54.     That is just the start, though. The Rule's definition of "transition risk" is all-encompassing. It "include[s], but [is] not limited to": "increased costs attributable to climate-related changes in law or policy, reduced market demand for carbon-intensive products leading to decreased sales, prices, or profits for such products, the devaluation or abandonment of assets, risk of legal liability and litigation defense costs, competitive pressures associated with the adoption of new technologies, reputational impacts (including those stemming from a registrant's customers or business counterparties) that might trigger changes to market behavior, changes in consumer preferences or behavior, or changes in a registrant's behavior." Ex.A.850–51. Under that definition, if a company's "customers and business counterparties" are deemed unpopular by environmental groups, that's a transition risk, and (for reasons entirely unexplained) the company likely must therefore disclose its Scope 1 and 2 emissions. *Id.*

55.     There are other serious flaws with the Rule's approach to materiality. Caselaw holds that information can be material only if it is "sufficiently specific," *City of Pontiac*, 752 F.3d at 185, but climate risks are guesswork because they rely on subjective modeling about events with horizons occurring over decades, premised on a panoply of subjective assumptions. 87 Fed. Reg. at 21,445, 21,427; Ex.B.3. That is because there is great uncertainty about the risks that will (or will not) flow from temperature changes. *See* Spencer Decl.¶¶37-40, https://www.sec.gov/comments/s7-10-22/s71022-20132160-302652.pdf#page=95. Climate models are consistently wrong and "have also historically overpredicted temperature rise." *Id.* ¶47. Even if future temperatures could be predicted with certainty, these are not "what businesses are being asked to assess. Instead, they are asked to apply extrapolations from these models to predict the effect of long-term weather changes on business operations." *Id.* ¶50.

56.     Other courts have held that this defeats materiality. When New York sued Exxon, alleging it had failed to disclose material information about contributions to climate change, the court found that none of the information was material because "[n]o reasonable investor during the period from 2013 to 2016 would make investment decisions based on speculative assumptions of costs that may be incurred 20+ or 30+ years in the future with respect to unidentified future projects." *People ex rel. James v. Exxon Mobil Corp.*, 119 N.Y.S.3d 829, *19 (Sup. Ct. 2019).

57.     The proposed rule justified mass climate disclosures on the theory that *every company* faces transition risk because climate change is supposedly an imminent world-ending catastrophe. *See* 87 Fed. Reg. at 21,336. Having realized it cannot simply demand blanket climate disclosures, the SEC tries to accomplish the same thing by omitting or incanting materiality. Either way, it is still unlawful. Ex.G.

### B.     The Rule Is Arbitrary and Capricious and Is Not Supported by Substantial Evidence.

58.     The Rule is also arbitrary and capricious and lacks substantial evidence.

59.     The substantial-evidence test "imposes a considerable burden on the agency." *Corrosion Proof Fittings v. EPA*, 947 F.2d 1201, 1214 (5th Cir. 1991).

60.     *First*, the SEC did not explain the switch in its position, held for decades, that it lacks authority to impose such broad climate disclosures. An agency must "display awareness that it *is* changing position" and "show that there are good reasons for the new policy." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). The SEC insists it hasn't changed its position at all, Ex.A.71–72, but of course the SEC has never before required such voluminous climate disclosures. These failures are necessarily arbitrary and capricious.

61.     *Second*, when there is "at best" "mixed" evidence showing that an SEC rule "will result in improved board and company performance and shareholder value," the rule lacks substantial evidence and therefore is invalid. *Bus. Roundtable v. SEC*, 647 F.3d 1144, 1151 (D.C. Cir. 2011).

62. The Rule admits that no study has shown an overall positive effect on corporate profitability or stock price as a result of mandating climate disclosures, while numerous studies found overall negative effects or no effect at all. Ex.A.658-59. That is not even "mixed" evidence—it is one-sided and squarely against the Rule's fundamental premise.

63. The Rule justifies itself on the theory that higher temperatures, droughts, and "exposure to physical climate risk" all reduce firm revenues, and that there is supposedly a relationship between climate information and asset pricing. Ex.A.647–49 & nn.2737–46. But a close review shows that 27 of the 34 articles cited for the Rule's core "benefits" were *never* mentioned in the proposed rule. Ex.A.646–50nn.2737–50. That alone renders the Rule unlawful. *See Am. Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 237 (D.C. Cir. 2008) ("[S]tudies upon which an agency relies in promulgating a rule must be made available during the rulemaking in order to afford interested persons meaningful notice and an opportunity for comment."); *Owner-Operator Indep. Drivers Ass'n, Inc. v. FMCSA*, 494 F.3d 188, 199 (D.C. Cir. 2007) (failure to do so is a "serious procedural error").

64. And no wonder the SEC didn't preview these articles supposedly providing the justification for the entire Rule. For example, the Rule admits that there are "seemingly contradictory empirical results" regarding "climate-related risks and asset prices." Ex.A.648n.2745. That is as close to a confession of "mixed" evidence as the Court will see—and thus the Rule lacks substantial evidence. *Bus. Roundtable*, 647 F.3d at 1151.

65. *Third*, the Rule "differs quite dramatically from the proposal, both by excluding major provisions and including new rule elements," Ex.B.3, which alone renders it arbitrary and capricious. "[T]he Proposed and Final Rule must be alike in kind so that commentators could have reasonably anticipated the Final Rule." *Mock v. Garland*, 75 F.4th 563, 584 (5th Cir. 2023). The Rule fails that test. In fact, in briefing at the Fifth Circuit, the SEC argued that a request to stay the proposed rule (made to the SEC in 2022) did not give the SEC "an opportunity to address specific arguments for a stay of the [Rule] *as adopted*," SEC Opp. at 6, which effectively concedes Plaintiffs' point that the Rule is unlawful because it was insufficiently "alike in kind" to the

proposed rule, and thus commentators could not "have reasonably anticipated the Final Rule," *Mock*, 75 F.4th at 584.

66.     *Fourth*, as explained above, the types of climate-risk and GHG emissions disclosures the Rule mandates are highly subjective and speculative. The Rule mandates "authoritative-looking results" that are ultimately "high-priced guesses" that will "spam investors" with useless information. Ex.B.1–3. That is arbitrary and capricious. *See Bus. Roundtable*, 647 F.3d at 1150–51.

67.     *Fifth*, the SEC also claims the Rule is justified by both institutional and individual investor demand, Ex.A.641-43, but the SEC points overwhelmingly to institutional and organizational comment letters, Ex.A.38–41nn.99–108. In any event, mere demand is insufficient because not "all facts which a reasonable shareholder might consider important" are actually *material*, especially where they lack a demonstrated connection to the financial performance that a "reasonable investor" seeks. *TSC*, 426 U.S. at 445. If it were otherwise, anything is fair game for mandatory disclosures as long as a vocal group asks for it.

### C.     The Rule Violates the First Amendment.

68.     Plaintiffs are also likely to succeed because the First Amendment prohibits the SEC from seeking disclosure of political issues under the guise of disclosure requirements.

69.     In *NIFLA v. Becerra*, the Supreme Court held that a compelled disclosure is subject to strict scrutiny (as a content-based regulation) unless it falls into one of two categories: (1) "laws that require professionals to disclose factual, noncontroversial information in their 'commercial speech'"; or (2) regulation of "professional conduct, even though that conduct incidentally involves speech." 585 U.S. 755, 768 (2018).

70.     The Rule requires disclosure of information that is "hardly factual and non-ideological," *NAM v. SEC*, 800 F.3d 518, 530 (D.C. Cir. 2015), because climate change in general is a politically charged matter, and the frameworks used are controversial. Whether emissions and climate change are material to corporate performance is a strongly debated political matter, and the disclosures are incredibly subjective and manipulable (as explained above).

71.     The Rule even expressly demands that companies "[d]escribe the board of directors' oversight of climate-related risks." Ex.A.852. The Rule forces Plaintiffs to talk about and take a side in the climate debates.

72.     Nor is the SEC "evenhanded." *AMI. v. U.S. Dep't of Agric.*, 760 F.3d 18, 34 (D.C. Cir. 2014) (Kavanaugh, J., concurring). The Rule does not address directly analogous matters that are contrary to the SEC's favored view on climate and environmental matters—e.g., the SEC doesn't contemplate the risk that the government *stops* providing subsidies to "green" companies. That is a tell-tale sign of a controversial regime masquerading as a disclosure rule.

73.     Because the Rule seeks controversial information, it triggers strict scrutiny, which it fails. Intermediate scrutiny should not apply because the proposed rule regulates far more than "speech proposing a commercial transaction," *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 561–62 (1980), but even if intermediate scrutiny did apply, the proposed rule would still fail.

74.     There is no sufficient government interest because the SEC has not demonstrated that requiring such exhaustive disclosures yields an important effect. In fact, the evidence is to the contrary. "[I]t is plainly not enough for the Government to say simply that it has a substantial interest in giving consumers information. After all, that would be true of any and all disclosure requirements." *AMI*, 760 F.3d at 31 (Kavanaugh, J., concurring). And "'consumer curiosity alone is not a strong enough state interest' to sustain a compelled commercial disclosure," even when it is of accurate, factual information. *AMI*, 760 F.3d at 32. Yet the Rule repeatedly invokes consumer interest as its driving force. *E.g.*, Ex.A.47.

75.     The D.C. Circuit has cautioned Congress itself against "requir[ing] issuers to disclose the labor conditions of their factories abroad or the political ideologies of their board members, as part of their annual reports[.] Those examples, *obviously repugnant to the First Amendment*, should not face relaxed review just because Congress used the 'securities' label." *NAM*, 800 F.3d at 555 (emphasis added). The same logic holds for forcing companies to participate in a dictated and confined way to the climate-change dialogue.

76.     For its part, the Rule addresses narrow tailoring only with *ipse dixit* that its requirements are "appropriately tailored." Ex.A.72. But as explained above, the Rule "is anything but a delicate exercise" of the SEC's disclosure power. *BST*, 17 F.4th at 612.

77.     At the very least, concerns about the constitutionality of the Rule caution strongly against the SEC's broad interpretations of its authority to mandate disclosure.

**II.     Plaintiffs Will Suffer Irreparable Injury.**

78.     "[C]omplying with a regulation later held invalid almost *always* produces the irreparable harm of nonrecoverable compliance costs." *BST Holdings*, 17 F.4th at 618. The SEC itself estimated that compliance with the Rule will cost at least $4.1 billion, with over $2.6 billion of that in the first year alone. *See* Ex.E.15.

79.     The formal data collection needed to comply with the Rule's severe weather event and climate-related risk disclosures begins in January 2025, but Plaintiffs will start incurring nonrecoverable compliance costs *now* because they must create "elaborate internal control systems and disclosure control procedures to capture and distill information related to physical and transition risks, severe weather events, severe natural conditions, and greenhouse gas emissions." Ex.B.2; Ex.E¶¶23–25.

80.     The Rule itself openly acknowledges there will be "immediate costs of compliance" for large-accelerated filers like Liberty. Ex.A.692.

81.     Plaintiff Nomad faces an especially imminent and irreparable harm because, as a small non-public company, it has no systems in place for collecting piles of compliance data, and thus will have to stand up those processes entirely from scratch so it can report them to Liberty. Ex.F.¶¶11–12.

82.     Plaintiffs will also imminently suffer impairment of First Amendment rights, including from their boards being forced to engage in the climate-change dialogue. The "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

III.     **The Equities and Public Interest Strongly Favor a Stay.**

83.     "[O]ur system does not permit agencies to act unlawfully even in pursuit of desirable ends." *Ala. Ass'n*, 141 S. Ct. at 2490. The SEC has no equitable interest in enforcement of an invalid rule, let alone one that marks a sudden and significant intrusion of the administrative state. By contrast, Plaintiffs have helped fuel the country's growth, provided significant improvements in quality of life, and helped lower energy bills for consumers. Ex.D¶¶14–21. The Rule seeks to cripple traditional-energy sector, with Plaintiffs and the general public paying the price.

## FIRST CAUSE OF ACTION

### Violation of the APA: Excess of Statutory Authority

84.     The allegations in paragraphs 1–83 are expressly incorporated herein as if restated in full.

85.     The APA requires a reviewing court to "hold unlawful and set aside agency action" that is "in excess of statutory ... authority." 5 U.S.C. § 706(2)(C).

86.     As explained above, the Rule exceeds the SEC's statutory authority because the major-questions doctrine applies, yet the SEC lacks clear authority for the Rule. Even if the major-questions doctrine did not apply, the SEC still lacks authority because the Rule exceeds the SEC's authority to require disclosure of balance-book information and company-specific material information.

## SECOND CAUSE OF ACTION

### Violation of the APA: Contrary to Law

87.     The allegations in paragraphs 1–83 are expressly incorporated herein as if restated in full.

88.     The APA requires a reviewing court to "hold unlawful and set aside agency action" that is "not in accordance with law." 5 U.S.C. § 706(2)(A).

89.     As explained above, the Rule is contrary to law because the SEC has authority only to mandate disclosure of balance-book information and company-specific material information.

### THIRD CAUSE OF ACTION

### Violation of APA: Arbitrary or Capricious

90.     The allegations in paragraphs 1–83 are expressly incorporated herein as if restated in full.

91.     The APA requires a reviewing court to "hold unlawful and set aside agency action" that is "arbitrary, [or] capricious." 5 U.S.C. § 706(2)(A).

92.     As explained above, the Rule evinces a significant change in SEC position, yet the SEC refuses even to admit that it has changed position. That is arbitrary and capricious.

93.     As explained above, the Rule also relies on evidence that is, at best, mixed, which renders the rule arbitrary and capricious and also deprives it of substantial evidence in support.

94.     As explained above, the Rule was not sufficiently alike in kind to the proposed rule.

95.     As explained above, the Rule requires voluminous disclosures, at the price tag of billions of dollars, that are largely just expensive guesses. That is arbitrary and capricious.

### FOURTH CAUSE OF ACTION

### Violation of the Securities Act

96.     The allegations in paragraphs 1–83 are expressly incorporated herein as if restated in full.

97.     As explained above, the Rule exceeds the SEC's statutory authority under the Securities Act because the major-questions doctrine applies, yet the SEC lacks clear authority for the Rule. Even if the major-questions doctrine did not apply, the SEC still lacks authority because it is limited to requiring disclosure of balance-book information and company-specific material information.

98.     Further, as explained above, the Rule lacks the substantial evidence required by the Securities Act.

**FIFTH CAUSE OF ACTION**

**Violation of the Exchange Act**

99.     The allegations in paragraphs 1–83 are expressly incorporated herein as if restated in full.

100.     As explained above, the Rule exceeds the SEC's statutory authority under the Exchange Act because the major-questions doctrine applies, yet the SEC lacks clear authority for the Rule. Even if the major-questions doctrine did not apply, the SEC still lacks authority because it is limited to requiring disclosure of balance-book information and company-specific material information.

101.     Further, as explained above, the Rule lacks the substantial evidence required by the Exchange Act.

**SIXTH CAUSE OF ACTION**

**Violation of the First Amendment to the U.S. Constitution**

102.     The allegations in paragraphs 1–83 are expressly incorporated herein as if restated in full.

103.     As explained above, the Rule violates the First Amendment because the Rule compels disclosures of non-factual and controversial information and makes companies engage in discussions about climate change and ultimately take sides in the climate debate, yet the Rule lacks a sufficient government interest and appropriate tailoring.

**SEVENTH CAUSE OF ACTION**

**Declaratory Judgment**

104.     The allegations in paragraphs 1–83 are expressly incorporated herein as if restated in full.

105.     Under the Declaratory Judgment Act, 28 U.S.C. § 2201, "any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

106.    For the same reasons as given above, the Court should declare the Rule violates the APA, the Securities Act, the Exchange Act, and the First Amendment.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

A) Declare that the Rule is unlawful, in violation of the APA, Securities Act, Exchange Act, and the First Amendment.

B) Vacate and set aside the Rule.

C) Enjoin Defendant from enforcing the Rule.

D) Stay the Rule pursuant to 5 U.S.C. § 705.

E) Award reasonable attorneys' fees and allowable costs, including under the Equal Access to Justice Act, 5 U.S.C. § 504, and 28 U.S.C. § 2412; and

F) Grant Plaintiffs such other and further relief to which they are justly entitled at law and in equity.

Respectfully submitted this 28th day of March 2024.

/s/ Jonathan Berry

Katherine C. Yarger*
LEHOTSKY KELLER COHN LLP
700 Colorado Blvd # 407
Denver, CO 80206

Jonathan Berry (NDTX # 1016352DC)
R. Trent McCotter*
Caleb Orr*
BOYDEN GRAY PLLC
801 17th Street Nw., Suite 350
Washington, DC 20006
(202) 955-0620
jberry@boydengray.com

* Motion for *pro hac vice* forthcoming